**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 17-cv-1194-WJM-SKC

ALIREZA VAZIRABADI,

      Plaintiff,

v.

DENVER PUBLIC SCHOOLS,
JOHN and JANE DOE 1 THROUGH 10,
JOHN and JANE DOE CORPORATIONS 1 THROUGH 10, and
OTHER JOHN DOE ENTITIES 1 THROUGH 10 all whose true names are unknown,

      Defendants.

---

## ORDER ON PENDING RECOMMENDATIONS AND MOTIONS

---

This matter is before the Court on two recommendations by United States Magistrate Judge S. Kato Crews. (ECF Nos. 125 & 135.) In the first recommendation, filed on March 6, 2019, Judge Crews recommended that this Court (1) deny Plaintiff Alireza Vazirabadi's ("Plaintiff" or "Vazirabadi") Motion to Amend Second Amended Complaint ("November 30, 2018 Motion to Amend"; ECF No. 108); and (2) deny Plaintiff's Second Motion to Amend Second Amended Complaint ("February 8, 2019 Motion to Amend"; ECF No. 118) (collectively, "Motions to Amend"). ("March 6, 2019 Recommendation"; ECF No. 125.)

In the second recommendation, filed on March 28, 2019, Judge Crews recommended that this Court (1) grant Defendant Denver Public Schools' ("DPS") Motion for Summary Judgment ("Motion for Summary Judgment"; ECF No. 116); (2) dismiss with prejudice Plaintiff's Second Amended Complaint ("Second Amended

Complaint"; ECF No. 67); (3) enter judgment in favor of DPS and against Plaintiff; (4) dismiss without prejudice the John and Jane Doe Corporations 1 through 10 ("Doe Corporations"); and (5) dismiss without prejudice the Other John Doe Entities 1 through 10 ("Doe Entities"). ("March 28, 2019 Recommendation"; ECF No. 135.)

The March 6, 2019 Recommendation and March 28, 2019 Recommendation are incorporated herein by reference. *See* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b). Plaintiff filed timely objections to the March 6, 2019 Recommendation ("March 12, 2019 Objection"; ECF No. 129) and the March 28, 2019 Recommendation ("April 11, 2019 Objection"; ECF No. 136).

Also pending before the Court are Plaintiff's (1) objection to Judge Crews's denial of his motion to compel ("Objection to Denial of Motion to Compel"; ECF No. 107); and (2) motion seeking leave to file a surreply ("Motion for Leave to File Surreply"; ECF No. 113).

For the reasons set forth below, the March 6, 2019 Recommendation is adopted in its entirety, Plaintiff's March 12, 2019 Objection is overruled, Plaintiff's November 30, 2018 Motion to Amend is denied, Plaintiff's February 8, 2019 Motion to Amend is denied, the March 28, 2019 Recommendation is adopted as modified, Plaintiff's April 11, 2019 Objection is overruled, DPS's Motion for Summary Judgment is granted, Plaintiff's Objection to Denial of Motion to Compel is overruled as moot, and Plaintiff's Motion for Leave to File Surreply is denied as moot.

## I. LEGAL STANDARD

When a magistrate judge issues a recommendation on a dispositive matter, Federal Rule of Civil Procedure 72(b)(3) requires that the district judge "determine *de*

2

*novo* any part of the magistrate judge's [recommendation] that has been properly objected to." An objection to a recommendation is properly made if it is both timely and specific. *United States v. 2121 East 30th St.*, 73 F.3d 1057, 1059 (10th Cir. 1996). An objection is sufficiently specific if it "enables the district judge to focus attention on those issues—factual and legal—that are at the heart of the parties' dispute." *Id.* In conducting its review, "[t]he district court judge may accept, reject, or modify the recommendation; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3). Here, Plaintiff filed a timely objection to the March 6, 2019 Recommendation and to the March 28, 2019 Recommendation. (*See* ECF Nos. 129 & 136.) Therefore, the Court reviews the issues before it *de novo*, except where otherwise noted.

In considering the recommendations, the Court is also mindful of Plaintiff's *pro se* status, and accordingly, reads his pleadings and filings liberally. *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972); *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007). The Court, however, cannot act as advocate for Plaintiff, who must still comply with the fundamental requirements of the Federal Rules of Civil Procedure. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991); *see also Ledbetter v. City of Topeka*, 318 F.3d 1183, 1188 (10th Cir. 2003).

## II. BACKGROUND

The following factual summary is primarily drawn from the various motions pending before the Court and documents submitted in support, as well as Plaintiff's Second Amended Complaint. These facts are undisputed unless attributed to a party.

**A.    Introduction**

Plaintiff is a 55-year-old Iranian-American citizen residing in Aurora, Colorado. (ECF No. 67 at 1, ¶ 1.)  In 2015, DPS was recruiting two Process Improvement Engineers ("PIE") for its Risk Management Department.  (ECF No. 116-1 at 1, ¶ 4.)  On August 3, 2015, Plaintiff applied for one of the positions after seeing DPS's job posting on a job listing website ("Job Posting"; *id*. at 11–12).  (ECF No. 67 at 4, ¶ 19; *see also* ECF No. 116-1 at 13–16.)  Plaintiff was invited to several rounds of interviews, but DPS chose to hire other candidates.  (ECF No. 116-1 at 1–3.)  This lawsuit followed.  (ECF No. 1.)

**B.    PIE Position Requirements**

The Job Posting described "the purpose of the [PIE] position, expected outcomes and results, and overview of areas of accountability," as follows:

> The Process Improvement Engineer (PIE) guides DPS departments in collaborative process improvement and re-engineering projects . . . .   The PIE will lead or mentor process owners through transformational business process definition and re-engineering projects . . . .
>
> In addition, the PIE will increase awareness of the value of business process improvement throughout DPS, will train and mentor DPS employees in the use of process improvement tools, and will share business process improvement best practices with other DPS initiatives.

(ECF No. 116-1 at 11.)

In describing "specific knowledge and qualifications required for the job," the Job Posting listed in pertinent part the following requirements:

> •     Strong interpersonal and teamwork skills with the ability to negotiate and influence others.

4

- Excellent [ ]verbal communication and presentation skills.

- Able to work collaboratively with cross functional teams and with DPS employees at all levels of the organization from executive leadership to line staff.

(*Id*. at 12.)

In detailing the "minimum education and experience required for the [PIE position]", the Job Posting provided that the applicant must have:

- [A] Bachelor's degree in Industrial Engineering.

- At least 5 years of work experience in continuous improvement or a related field, with a focus on process design/re-engineering and Lean Six Sigma.

- At least 5 years of work experience in cross-functional project management.

(*Id*.)

## C.    PIE Recruitment Process

When there is a vacancy for a PIE position, the job is posted by DPS, and candidates submit an application and other materials, including resumes and cover letters, through DPS's online application system.  (*Id*. at 2, ¶ 5; *see also* ECF No. 67 at 4, ¶ 19.)

During the relevant time period, Karen Johnson served as DPS's Senior Manager of Process Improvement and the hiring manager for PIEs.  (ECF No. 116-1 at 1, ¶¶ 2, 4.)  Johnson's standard practice is to gather resumes and cover letters from the online applications and select candidates for phone interviews.  (*Id*. at 2, ¶ 5.)  After conducting phone interviews, Johnson chooses candidates to advance to the following

in-person interviews: (1) one panel interview with Johnson and the PIEs on her team; and (2) one interview with DPS's Director of Risk Management, Terri Sahli, who was Johnson's supervisor at the time. (*Id*.)

**D.  Plaintiff's Application for the PIE Position**

Twenty-six individuals, including Plaintiff, applied for one or both of the two vacant PIE positions using DPS's online application system. (*Id*. at 2, ¶ 5; *see also* ECF No. 117 at 27.) To apply, applicants had to complete a DPS online job application ("Job Application"; ECF No. 116-3). (ECF No. 116-1 at 2–3, ¶¶ 5, 13.) The Job Application asked applicants a set of 13 questions, such as:

- Are you eligible for employment in the United States?

- Are you presently employed? If so, where?

- Are you 18 years or older?

(*See* ECF No. 116-3.) In pertinent part, the Job Application asked applicants to indicate whether they were "bilingual," and if so, to identify the language. (*Id*. at 2.) In his Job Application, Plaintiff answered that he was bilingual in "Farsi/Persian." (*Id*.) Plaintiff claims that this answer "identified his Iranian heritage/national origin." (ECF No. 140 at 2, ¶ 3.) However, the Job Application did not ask for, and Plaintiff did not provide, his age or national origin. (*See* ECF No. 116-3.)

After completing the Job Application, applicants were then asked to submit their cover letters and resumes to DPS's online application system. (ECF No. 116-1 at 2–3, ¶¶ 5, 13.) Plaintiff submitted both documents, but did not state his age, national origin, or language proficiency in either document. (*Id*. at 13–16.) Johnson gathered the

6

applicants' resumes and cover letters, and selected nine candidates, including Plaintiff, for phone interviews.  (*Id*. at 2, ¶¶ 5, 7.)

**E.  Phone Interviews**

The phone interviews were conducted by Johnson and lasted from 45 to 60 minutes.  (*Id*. at 32.)  Johnson interviewed all nine candidates by phone between August 28 and September 2, 2015.  (*Id*. at 27, 32.)  During the phone interviews, Johnson asked each of the nine candidates the same set of questions, none of which concerned the candidate's age, national origin, or language proficiency.  (*See id*. at 21–26.)

Plaintiff's phone interview took place on August 31, 2015.  (*Id*. at 27, 31.)  During the interview, Johnson informed Plaintiff that there were two open PIE positions and that he would "be considered for both."  (ECF No. 136 at 12, ¶ 7.1.)  Plaintiff took this comment as "positive feedback."  (*Id*.)  In the interview, Plaintiff did not discuss his age, national origin, or language proficiency with Johnson.  (ECF No. 116-1 at 3, ¶ 13; *see also id*. at 21–22; ECF No. 116-4 at 2; ECF No. 116-6 at 4, 10.)

**F.  Panel Interviews**

After conducting the phone interviews, Johnson chose six candidates, including Plaintiff, for the in-person interviews.  (ECF No. 116-1 at 2, ¶ 8.)  The candidate pool narrowed to five after one applicant declined to interview.  (*Id*.)

The purpose of the panel interview was to test a candidate's facilitation skills and the essential functions of the PIE position, including: (1) the ability to achieve project results working closely and collaboratively with executive sponsors, process owners,

and project teams; (2) strong interpersonal and teamwork skills with the ability to negotiate and influence others; and (3) the ability to work collaboratively with cross functional teams and with School District employees at all levels of the organization from executive leadership to line staff.  (*Id*. at 2, ¶¶ 4, 8; *see also id*. at 11–12.)  To test these skills, the panel asked each candidate "to facilitate a group discussion on the topic of 'things to do for a team building event in Denver [the "Facilitation Question"].'" (*Id*. at 2, ¶ 8.; *see also* ECF No. 67 at 7, ¶ 24; ECF No. 117 at 25–26.)

Plaintiff's panel interview took place on September 10, 2015.  (ECF No. 67 at 7, ¶ 24; ECF No. 116-1 at 29.)  Plaintiff's interviewers consisted of Johnson and the three incumbent PIEs—Andra Manczur, Katie Wolters, and Jeffrey Gwaltney.  (ECF No. 116-1 at 2, ¶ 8.)  According to Plaintiff, all of the panel members "had 2-page interview questionnaire[s]," on which they "continuously made hand-written notes" for the duration of his panel interview.  (ECF No. 117 at 13, ¶ 5; *see also id*. at 17–18.)  In his panel interview, Plaintiff did not discuss his age or national origin.  (ECF No. 116-1 at 3, ¶ 13; *see also* ECF No. 116-4 at 2; ECF No. 116-5 at 2, ¶ 7; ECF No. 116-6 at 7, 10.)

In her affidavit, Johnson described Plaintiff's performance at his panel interview, particularly in regard to how Plaintiff answered the Facilitation Question, as follows:

> [Mr. Vazirabadi] performed poorly.  Instead of facilitating a group discussion, he dictated it.  He was unable to make all the Process Improvement team members feel he was listening to their ideas, and rather than engaging us and drawing out ideas about potential team building events in Denver, he told us what we should do.  Mr. Vazirabadi also focused mostly on me instead of giving everyone on the team equal attention.  Although Mr. Vazirabadi had many years of engineering experience, it was clear after the panel interview that he was unlikely to meet the School District's needs and be successful in the PIE position.

(ECF No. 116-1 at 2–3, ¶ 9.)

Gwaltney's account of how Plaintiff performed in his panel interview is similar to Johnson's description:

> Mr. Vazirabadi did not do well in his interview. He dominated the discussion rather than facilitate it, telling [the interviewers] what we should do in Denver rather than elicit our own ideas. It was more like a lecture than a shared discussion, with little collaboration. Mr. Vazirabadi also seemed to focus most of his attention on Ms. Johnson, neglecting me and my colleagues Andra Manczur and Katie Wolters. As someone who was working as a PIE, it was apparent to me that Mr. Vazirabadi did not show the facilitation skills needed for the job. To be successful, a PIE must have strong interpersonal skills, be an excellent listener, and have the ability to work collaboratively with employees at every level of the School District.

(ECF No. 116-5 at 1, ¶ 4.)

Plaintiff disputes these accounts, asserting that Johnson and Gwaltney's "characterization of [his] facilitation performance is categorically false, untrue, defamatory and extremely hurtful." (ECF No. 117 at 13–14, ¶ 5.) In particular, Plaintiff alleges that he "had excellent interactions and chemistry with all the panel members, for the entire 60 minute interview." (*Id*. at 13, ¶ 5.)

From his fillings, it is evident that one event in particular is of great importance to Plaintiff. (*See, e.g.*, ECF No. 1 at 4–5, ¶¶ 23, 25; ECF No. 67 at 7–8, ¶¶ 24, 29; ECF No. 117 at 5, 13, ¶¶ 5, 9; ECF No. 118 at 86–87, 117–118; ECF No. 129 at 5, ¶ 10; ECF No. 136 at 14, ¶ 7.7; ECF No. 140 at 2, ¶ 5.) This "memorable and validating moment" occurred right before Plaintiff left the panel interview room, when Gwaltney asked Plaintiff: "do you like to be called Alireza or Ali?" (ECF No. 67 at 7, ¶ 24.)

Noticing that the other panel members were awaiting his response, Plaintiff responded "Ali." (*Id*.) Plaintiff asserts that Gwaltney's question "proves the interview panel was looking forward to [Plaintiff's] immediate hiring" and that a "picture fails to capture" these "last few exchanged words saying over 1000 words." (*Id*.; ECF No. 136 at 18.)

In his response to the Motion for Summary Judgment, Plaintiff attached as an exhibit a "Team Facilitation Narrative," wherein Plaintiff describes in detail his version of how his panel interview transpired when he was asked the Facilitation Question. (ECF No. 117 at 25–26.) From his narrative, Plaintiff appears to be arguing that, contrary to Johnson and Gwaltney's assertions, his interview went well as the panel members showed "sincere excitement," laughed at his "funny joke[s]," and smiled approvingly. (*Id*. (emphasis omitted).) In addition, Plaintiff appears to describe a more collaborative environment, one where he did not dominate the discussion. (*Id*.)

In Johnson and Gwaltney's affidavits, they discuss how two of the candidates, Thach Nguyen and Ashley Schroeder (who were ultimately hired), significantly outperformed Plaintiff in their panel interviews. (*See* ECF No. 116-1 at 3, ¶ 10; ECF No. 116-5 at 2, ¶ 5.) In particular, they discuss how Nguyen and Schroeder "demonstrated strong collaborative skills," superior listening skills, and were able to successfully facilitate a group discussion in a collaborative manner that involved the entire group. (ECF No. 116-1 at 3, ¶ 10; ECF No. 116-5 at 2, ¶ 5.)

## G.    Plaintiff's Interview with Sahli

Plaintiff and each of the other candidates who participated in the panel interviews also interviewed with Sahli. (ECF No. 116-1 at 2, ¶ 5; ECF No. 116-2 at 2,

¶¶ 7, 9.)  Sahli's "only role in the hiring process was to conduct a short one-on-one interview with each finalist Ms. Johnson identified and then provide feedback to Ms. Johnson," but ultimately the "hiring decisions were made by Ms. Johnson."  (ECF No. 116-2 at 2, ¶ 7.)

Plaintiff's one-on-one interview with Sahli took place on September 15, 2015.  (ECF No. 116-1 at 29.)  The following is Sahli's account of the interview:

> Mr. Vazirabadi came across as very sale-and-entrepreneurial-oriented.  PIEs do not work in isolation, and their role is not to solicit business within the School District.  My impression was that Mr. Vazirabadi would not be able to work collaboratively and consultatively in a team role.  I also did not feel that Mr. Vazirabadi would be able to work within the standardized service model Ms. Johnson implements.

(ECF No. 116-2 at 2, ¶ 9.)  During the interview, Sahli did not ask and Plaintiff did not disclose his age, national origin, or proficiency in "Farsi/Persian."  (*Id*. at 2, ¶ 10; *see also* ECF No. 116-4 at 2; ECF No. 116-6 at 7, 10.)

## H.    Resumes of the Relevant Applicants

The resumes of the applicants also played an important role in Johnson's hiring decision.  (*See* ECF No. 116 at 5, 15; ECF No. 116-1 at 2–3, ¶¶ 7, 12.)  In regard to Plaintiff, Johnson noted that he has a Bachelor of Science in Industrial Engineering from the University of Wisconsin–Stout, and that he had over 20 years of engineering experience in California and Colorado.  (ECF No. 116-1 at 2, ¶ 7; *see also id*. at 15–16.)  However, Johnson also noted that since October 2013, Plaintiff's only occupation had been as an UberX Driver and that he had a "previous four-year gap in professional employment while he served as a caregiver."  (*Id*. at 2, ¶ 7; *see also id*. at 15.)  Plaintiff

was 52 years-old when he interviewed with DPS for the PIE positions. (ECF No. 140 at 3–4, ¶ 11.)

Nguyen has a Bachelor of Science in Materials Science and Engineering from Cornell University's College of Engineering. (ECF No. 116-1 at 18; *see also* ECF No. 116 at 5, ¶ 14.) At the time of his interviews, Nguyen had over six years of relevant engineering experience with no gaps in his professional employment. (ECF No. 116-1 at 18; *see also* ECF No. 116 at 5, ¶ 14.) Nguyen was 28 years-old when DPS offered him the PIE position. (ECF No. 67 at 3, ¶ 17.)

Schroeder has a Bachelor in Science in Industrial Engineering from the University of Michigan's College of Engineering. (ECF No. 116-1 at 19–20; *see also* ECF No. 116 at 5, ¶ 14.) At the time of her interviews, Schroeder had over five years of relevant engineering experience with no gaps in her professional employment. (ECF No. 116-1 at 19–20; *see also* ECF No. 116 at 5, ¶ 14.) Schroeder was "in her thirties" when DPS offered her the PIE position. (ECF No. 67 at 3, ¶ 17.)

## I.    Hiring Decision

After the last panel interview concluded on September 21, 2015, the panel met to rank the five candidates from one to five, with one being the most desirable candidate, and five being the least desirable. (ECF No. 116-1 at 3, ¶ 11; *see also id*. at 29–30.) Each panelist individually ranked the candidates in the exact same order: Schroeder was the highest ranked candidate (with a ranking of one), Nguyen was the second highest ranked candidate (with a ranking of two), and Plaintiff was the lowest

ranked candidate (with a ranking of five).[1]  (ECF No. 116-1 at 3, ¶ 11; ECF No. 116-5 at

2, ¶ 6; ECF No. 121-1 at 4–5.)  Johnson recorded these rankings onto a spreadsheet

(titled "Ranking Matrix") and included the following comment about Plaintiff:  "Good

experience, not a good team fit.  Not sure if he would work well on a team."[2]  (ECF No.

116-1 at 30; *see also* ECF No. 121-1 at 5.)

After this discussion, Johnson decided to offer the open PIE positions to Nguyen

and Schroeder.  She determined that "[t]hey both had the requisite engineering

experience and displayed the best collaboration, leadership, interpersonal, and

teamwork skills."  (ECF No. 116-1 at 3, ¶ 12.)  Schroeder and Nguyen accepted the

offers of employment and advanced to background screening with DPS's Human

Resources Department.  (*Id*.; *see also id*. at 40–43.)  On September 23, 2015, Johnson

informed Plaintiff that DPS had decided to hire other candidates.  (*Id*. at 39.)

Johnson asserts that at the time she made her hiring decision for the PIE

positions, she was not aware that applicants were required to complete the online Job

Application questions before submitting their resumes and cover letters, and therefore

---

[1] Plaintiff argues that the "Ranking Matrix analysis proves Vazirabadi is [the] highest ranked candidate" since he had the highest numerical ranking.  (ECF No. 136 at 14, ¶ 7.8; *see also* ECF No. 122 at 8–9, ¶ 5.)  Plaintiff supports this assertion by pointing to the interview questionnaires the panel members allegedly took notes on during his interview.  (ECF No. 122 at 12–13.)  On the questionnaires, there is an "Overall Ranking" index, in which a higher score correlates with a higher ranking, and vice versa.  (*Id*. at 13.)  Thus, Plaintiff appears to argue that since he had the highest numerical ranking of five, he was actually the highest ranked candidate when compared to the other candidates who had lower numerical rankings—namely, one through four.  (*See* ECF No. 116-1 at 30.)

[2] Plaintiff was not the only candidate the panel determined would not work well on their team.  (*See* ECF 116-1 at 30.)  Similarly, the panel found that the third ranked candidate—who had "[e]xcellent experience" as opposed to Plaintiff's "[g]ood experience"—was "not a good team fit."  (*Id*.)

13

she was not aware of any applicant's responses on these questions, including responses to the bilingual question.  (*Id*. at 3, ¶ 13.)   Further, it is undisputed that Plaintiff did not report or identify his age or national origin in his Job Application, in his cover letter, on his resume, or otherwise at any stage of his interviews.  (*Id*.; *see also id*. at 13–16; ECF No. 116-3; ECF No. 116-4 at 2; ECF No. 116-6 at 7, 10.)  Other than identifying that he was bilingual in Farsi/Persian on the Job Application, Plaintiff did not further indicate his bilingualism on any materials or at any other stage in the process.  (ECF No. 116-1 at 3, ¶ 13; *see also id*. at 13–16; ECF No. 116-3; ECF No. 116-4 at 2; ECF No. 116-6 at 7, 10.)  Thus, Johnson asserts that the "age, national origin, and language proficiency of Mr. Vazirabadi, Mr. Nguyen, and Ms. Schroeder had no bearing whatsoever on [her] hiring decisions for the PIE positions."  (ECF No. 116-1 at 3, ¶ 13.)

In sum, the only evidence to suggest that DPS knew of Plaintiff's national origin is that he reported being bilingual in "Farsi/Persian" on his Job Application.  (ECF No. 67 at 10–11; *see also* ECF No. 116-3 at 2; ECF No. 116-4 at 2; ECF No. 116-6 at 10.)  Meanwhile, Plaintiff's only allegation concerning his age is that Johnson and the other interviewers inferred his age from his physical appearance.  (*See* ECF No. 116-4 at 2; ECF No. 116-6 at 7.)

### III.  PROCEDURAL HISTORY

Plaintiff initiated this action on May 15, 2017.  (ECF No. 1.)  After DPS filed a motion to dismiss Plaintiff's complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Plaintiff filed his First Amended Complaint as a matter of course on July 14, 2017.  (ECF Nos. 22 & 26.)  In his First Amended Complaint, Plaintiff

brought six claims against DPS and several others.  (ECF No. 26.)

On July 28, 2017, DPS filed a motion to dismiss Plaintiff's First Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (ECF No. 29.)  On March 30, 2018, this Court granted the motion in part and dismissed all of Plaintiff's claims except for his claim against DPS for national origin discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq*.  (ECF No. 50.)  On May 7, 2018, Plaintiff filed a motion to amend his First Amended Complaint.  (ECF No. 60.)

On May 11, 2018, United States Magistrate Judge Michael E. Hegarty held a scheduling conference and set case deadlines to guide these proceedings.  (ECF No. 62.)  Specifically, Judge Hegarty set a deadline of June 30, 2018, as the last day to add parties or amend the pleadings ("June 30, 2018 Deadline"; ECF No. 63 at 11).  *Id*. During the Scheduling Conference, Judge Hegarty granted Plaintiff's motion to file a Second Amended Complaint, which was docketed on May 15, 2018.[3]  (ECF Nos. 62 & 67.)  In the Second Amended Complaint, Plaintiff brings action against DPS, the Doe Corporations, the Doe Entities, and John and Jane Doe 1 through 10 (the "Doe Individuals") for national origin discrimination in violation of Title VII and for age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq*.  (ECF No. 67.)

During discovery, Plaintiff served a subpoena to produce on a non-party, Infor, Inc. ("Infor").  (ECF No. 94.)  Infor is a software company that licenses online job

---

[3] On August 6, 2018, this case was reassigned to Judge Crews.  (ECF No. 85.)

application software to DPS.  (ECF No. 99 at 2.)  DPS used Infor's software for the

online Job Application, which included the question of whether the applicant is bilingual.

(ECF No. 97 at 2, ¶ 4.)  With his subpoena to Infor, Plaintiff sought, among other

information, production of various data related to Infor's development of the "bilingual

question" used by DPS.  (*Id*.; *see also* ECF No. 94.)  Infor refused to produce the

requested information, leading Plaintiff to file a motion to compel.  (ECF No. 97 at 1,

¶ 1.)  On November 6, 2018, Judge Crews held a hearing on the motion to compel.

(ECF No. 106.)  After discussion and argument regarding the motion, Judge Crews

denied Plaintiff's motion to compel.  (*Id*.; *see also* ECF No. 109 at 24.)

   As a result, Plaintiff filed his Objection to Denial of Motion to Compel, which is

currently pending before the Court.  (ECF No. 107.)  Infor subsequently responded to

Plaintiff's objection.  (ECF No. 111.)  On December 5, 2018, Plaintiff filed a surreply

(ECF No. 112) to Infor's response and a Motion for Leave to File Surreply (ECF

No. 113), which is currently pending before the Court.  (*Id*.)

   Five months after the June 30, 2018 Deadline for amending pleadings and

adding parties, Plaintiff filed the November 30, 2018 Motion to Amend.  (ECF No. 108.)

While that motion was still pending before the Court, Plaintiff filed the February 8, 2019

Motion to Amend.  (ECF No. 118.)  Through these Motions to Amend, Plaintiff seeks to

add four new parties: (1) Infor; (2) Charles Philips (Infor's CEO), in his individual

capacity; (3) Johnson, in her individual capacity; and (4) Gwaltney, in his individual

capacity.  (ECF Nos. 108 & 118.)  In addition, Plaintiff seeks to add various claims

against DPS and these four parties for conspiracy, invasion of privacy, and conspiracy

to violate Title VII.  (*See* ECF Nos. 108 & 118.)  Judge Crews reviewed the November

30, 2018 Motion to Amend and the February 8, 2019 Motion to Amend, and issued his March 6, 2019 Recommendation. (ECF No. 125.)

On January 14, 2019, DPS moved for summary judgment, arguing that the record clearly establishes that Plaintiff's age and national original did not play a role in DPS's hiring decision. (ECF No. 116.) Judge Crews reviewed DPS's Motion for Summary Judgment and issued his March 28, 2019 Recommendation. (ECF No. 135.)

### IV. MOTIONS TO AMEND SECOND AMENDED COMPLAINT

In the March 6, 2019 Recommendation (referred to as the "Recommendation" for the remainder of this Section IV), Judge Crews recommended that Plaintiff's November 30, 2018 Motion to Amend (ECF No. 108) and February 8, 2019 Motion to Amend (ECF No. 118) be denied. (ECF No. 125.) Plaintiff's March 12, 2019 Objection (referred to as the "Objection" for the remainder of this Section IV) disputes various portions of the Recommendation. (ECF No. 129.) After discussing the controlling law, the Court will address Judge Crews's findings and Plaintiff's objections in turn.

### A. Standard for Modifying the Scheduling Order After the Deadline

"After a scheduling order deadline, a party seeking leave to amend must demonstrate (1) good cause for seeking modification under Fed. R. Civ. P. 16(b)(4) and (2) satisfaction of the Rule 15(a) standard." *Gorsuch, Ltd., B.C. v. Wells Fargo Nat. Bank Ass'n*, 771 F.3d 1230, 1240 (10th Cir. 2014). If a plaintiff fails to satisfy either factor—(1) good cause or (2) Rule 15(a)—then the plaintiff is not entitled to have the scheduling order modified. *Id*. at 1241.

Rule 16 of the Federal Rules of Civil Procedure provides that a scheduling order

"may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "Good cause" under this rule "is much different than the more lenient standard contained in Rule 15(a). Rule 16(b) does not focus on the bad faith of the [plaintiff], or the prejudice to the opposing party." *Colo. Visionary Acad. v. Medtronic, Inc.*, 194 F.R.D. 684, 687 (D. Colo. 2000). Rather, Rule 16(b) focuses on the "diligence of the party seeking leave to modify the scheduling order to permit the proposed amendment." *Id.*

In practice, this standard requires the plaintiff "to show the scheduling deadlines cannot be met despite [the plaintiff's] diligent efforts." *Gorsuch*, 711 F.3d at 1240 (internal quotation marks omitted). "Rule 16's good cause requirement may be satisfied, for example, if a plaintiff learns new information through discovery or if the underlying law has changed." *Id.* "If the plaintiff knew of the underlying conduct but simply failed to raise [the] claims, however, the claims are barred." *Id.* Moreover, district courts are "afforded wide discretion" in their application of the good cause standard under Rule 16(b). *Bylin v. Billings*, 568 F.3d 1224, 1231 (10th Cir. 2009).

**B.     The November 30, 2018 Motion to Amend**

1.     <u>The Recommendation</u>

In the Recommendation, Judge Crews found that Plaintiff had not sustained his burden under Rule 16(b)(4) as he had failed to establish that good cause supports modifying the Scheduling Order. (ECF No. 125 at 6–9.) As a result, Judge Crews recommended that Plaintiff's November 30, 2018 Motion to Amend be denied. (*Id.* at 13.)

18

At the outset, the Recommendation noted that the November 30, 2018 Motion to Amend—wherein Plaintiff seeks to add Infor and its CEO—was filed 153 days after the June 30, 2018 Deadline for amending pleadings and adding parties. (*Id*. at 6.) Plaintiff argued that he had only learned of Infor's involvement in this case after obtaining certain discovery. (*Id*.; *see also* ECF No. 108 at 2, ¶ 4.) The Recommendation found that Plaintiff's argument was not persuasive because Plaintiff had acquired this information on August 16, 2018—106 days before Plaintiff filed his November 30, 2018 Motion to Amend. (ECF No. 125 at 6.)

The Recommendation noted that after learning of Infor's alleged involvement in the case on August 16, 2018, Plaintiff chose to undertake the following actions concerning the software company:

> Vazirabadi's subpoena to Infor [was served on] August 20, 2018 [ECF No. 94 at 2]; he filed a motion to compel Infor to comply with the subpoena on September 24, 2018 [ECF No. 97]; the [c]ourt held a hearing on the motion to compel, and denied it, on November 6, 2018 [ECF No. 106]; and, Vazirabadi filed an objection to this [c]ourt's denial of the motion to compel on November 19, 2018 [ECF No. 107].

(ECF No. 125 at 6–7.) Judge Crews emphasized that "[d]espite all of this activity regarding Infor from August 16 to November 19, 2018, Vazirabadi did not seek to add Infor (or its CEO) as a defendant to this case until November 30, 2018." (*Id*. at 7.)

Judge Crews noted that instead of seeking to amend his complaint "as soon as he became aware of the underlying facts described in his motion[ ], Vazirabadi waited several months to make his request." (*Id*. at 8.) Indeed, Judge Crews found that the "timing, facts, and course of this litigation suggest that Vazirabadi knew the circumstances giving rise to his purported amendments far earlier than when he chose

to file the [November 30, 2018 Motion to Amend]." (*Id*.) For these reasons, Judge Crews determined that Plaintiff had not sustained his burden under Rule 16(b)(4) and thus recommended that Plaintiff's November 30, 2018 Motion to Amend be denied. (*Id*. at 9, 13.)

2. <u>Plaintiff's Objections</u>

In the Objection, Plaintiff concedes that he had learned of Infor's existence on August 16, 2018, but nonetheless argues that he exercised "**100% Due Diligence**" in filing his November 30, 2018 Motion to Amend since he sought discovery "<u>11 days</u>" after learning of Infor's alleged involvement in the case. (ECF No. 129 at 3, ¶ 5 (emphasis in original).)

In support, Plaintiff highlights how he promptly served a subpoena on Infor, and followed with a motion to compel disclosure on September 24, 2018. (*Id*.) Plaintiff also discusses how his motion to compel was subsequently denied by Judge Crews, and how his objection to that ruling is still pending before this Court. (*Id*. at 3, ¶¶ 5–6.)

3. <u>Analysis</u>

The Court finds Plaintiff's arguments to be wholly unconvincing. Rule 16(b)'s "good cause" standard "requires the [plaintiff] to show the scheduling deadlines cannot be met despite [the plaintiff's] diligent efforts." *Gorsuch*, 711 F.3d at 1240 (internal quotation marks omitted). Here, Plaintiff does not attempt to satisfy that standard. Instead, he argues that he should be allowed to add Infor and its CEO as parties to this action, even though the deadline for adding parties has long elapsed, because he diligently sought discovery from Infor. This clearly does not make the requisite showing

that the scheduling deadline could not have been met despite Plaintiff's diligent efforts.

Indeed, Plaintiff's actions in seeking discovery from Infor supports the finding that Plaintiff has failed to demonstrate good cause since Plaintiff strategically chose to seek non-party discovery from Infor for over three months, but did not attempt to add it as a party. (*See* ECF No. 125 at 7 ("Despite all of this activity regarding Infor from August 16 to November 19, 2018, [Plaintiff] did not seek to add Infor (or its CEO) as a defendant to this case until November 30, 2018").) Plaintiff made the tactical choice to seek discovery from Infor and not add them as a party. It was only when Plaintiff had exhausted his discovery avenues in regard to Infor that he attempted to add it as a party. *See Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 865 (5th Cir. 2003) (where plaintiffs "deliberately chose to delay amending their complaint, . . . a busy court need not allow itself to be imposed upon by the presentation of theories seriatim") (internal quotations marks ommitted).

The Court recognizes that the good cause requirement may be satisfied "if a plaintiff learns new information through discovery." *Gorsuch*, 711 F.3d at 1240. At first glance, it would appear that Plaintiff's November 30, 2018 Motion to Amend could potentially fall within this category as he learned about Infor through discovery on August 16, 2018, after the June 30, 2018 Deadline for amending pleadings. However, Plaintiff did not file his motion to amend right away or in a timely fashion—nor did Plaintiff exercise diligence in his efforts to amend his complaint. Instead, he waited 106 days before filing his November 30, 2018 Motion to Amend. When a "plaintiff knew of the underlying conduct but simply failed to raise [the] claims, . . . the claims are barred." *Id*. Here, Plaintiff knew of the underlying conduct concerning his claims against Infor

21

and its CEO on August 16, 2018, but he failed to raise those claims until November 30, 2018. As a result, Plaintiff is not entitled to leave in order to bring those claims.

The Court also acknowledges that Plaintiff is proceeding *pro se*, but even then, he is held to the same rules of procedure that govern other litigants. *See Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005) ("[t]his court has repeatedly insisted that pro se parties follow the same rules of procedure that govern other litigants"). Moreover, the Court frankly finds the record to be entirely devoid of anything that could lend credence to the notion that good cause exists for allowing Plaintiff to amend his complaint.

In sum, Plaintiff has failed to show that the June 30, 2018 Deadline could not have been met despite his diligent efforts. *See Gorsuch*, 711 F.3d at 1240. Rather, the record clearly shows that Plaintiff knew of the information underlying his November 30, 2018 Motion to Amend over 100 days before he attempted to amend his complaint. As a result, Plaintiff has failed to satisfy Rule 16(b)'s good cause inquiry and therefore he is not entitled to leave to amend.[4] *See id*. at 1240–41. Accordingly, the Court adopts the Recommendation to the extent it denies Plaintiff's November 30, 2018 Motion to Amend.

## C. February 8, 2019 Motion to Amend

### 1. The Recommendation

---

[4] In the Recommendation, Judge Crews found that Plaintiff's November 30, 2018 Motion to Amend should also be denied because Plaintiff had failed to satisfy Rule 15(a). (ECF No. 125 at 9–12.) Because the Court finds that no good cause exists for amending the Scheduling Order, it need not consider the Recommendation's findings, nor Plaintiff's objections, concerning whether Plaintiff has satisfied Rule 15(a). *See Gorsuch*, 771 F.3d at 1240–41.

In the Recommendation, Judge Crews found that Plaintiff had not sustained his burden under Rule 16(b)(4) as he had failed to demonstrate that good cause supports modifying the Scheduling Order. (ECF No. 125 at 6–9.) As a result, Judge Crews recommended that Plaintiff's February 8, 2019 Motion to Amend be denied. (*Id*. at 13.)

Judge Crews highlighted how Plaintiff's February 8, 2019 Motion to Amend—wherein Plaintiff seeks to add Johnson and Gwaltney—was filed 223 days after the June 30, 2018 Deadline for amending pleadings and adding parties. (*Id*. at 6.) Judge Crews then discussed how Plaintiff seeks to add Johnson and Gwaltney based on their affidavits submitted in support of DPS's Motion for Summary Judgment on January 14, 2019, wherein they averred that Plaintiff performed poorly in his panel interview. (*Id*. at 7.) Judge Crews noted, however, that the "information contained in Johnson and Gwaltney's affidavits is not new" as "it has always been DPS's position that Plaintiff performed poorly during his [panel] interview." (*Id*. at 7 (citing ECF No. 53 at 4–5, ¶ 24).)

Judge Crews noted that Plaintiff's Second Amended Complaint, which was docketed on May 15, 2018, "refers to both Johnson and Gwaltney," discusses how "they were part of a team of interviewers who interviewed Vazirabadi, and that he 'did poorly' during a part of his interview." (ECF No. 125 at 7 (quoting ECF No. 67 at 4, 17 ¶ 18).) Judge Crews further observed that Plaintiff's Second Amended Complaint "even alleges that DPS 'falsified [Vazirabadi's] panel interview performance' by stating that he 'did poorly' during a part of his interview." (ECF No. 125 at 7 (quoting ECF No. 67 at 4 ¶ 18).) The Recommendation found that "[d]espite his knowledge of Johnson and Gwaltney since at least May 15, 2018, including their role in his interview and DPS's

23

position that he 'did poorly' during a part of the interview in which Johnson and Gwaltney participated, Vazirabadi waited over eight months before seeking to add these individuals as named defendants to this case."  (ECF No. 125 at 7–8.)

Judge Crews noted that instead of seeking to amend his complaint "as soon as he became aware of the underlying facts described in his motion[ ], Vazirabadi waited several months to make his request."  (*Id*. at 8.)  Indeed, Judge Crews found that the "timing, facts, and course of this litigation suggest that Vazirabadi knew the circumstances giving rise to his purported amendments far earlier than when he chose to file the [February 8, 2019 Motion to Amend]."  (*Id*.)  For all these reasons, Judge Crews found that Plaintiff failed to show good cause to modify the Scheduling Order and therefore recommended Plaintiff's February 8, 2019 Motion to Amend be denied. (*Id*. at 9, 13.)

2.    Plaintiff's Objections

In the Objection, Plaintiff acknowledges that his February 8, 2019 Motion to Amend was filed 223 days after the deadline set forth in the Scheduling Order, but argues that there is good cause to amend the Scheduling Order because Johnson and Gwaltney did not file their affidavits until January 14, 2019.  (ECF No. 129 at 4, ¶ 10.) Plaintiff alleges that Johnson and Gwaltney's affidavits are "totally false, factually contradictory, **solidly incriminating** that **domino-like**, **factually substantiates *all*** of Vazirabadi's claims that indeed: (a) Vazirabadi was highest ranked hiring candidate, (b) defendants [*sic*] did not hire him despite his highest ranking," and so on.  (*Id*. at 4–6 (emphasis in original).)

Plaintiff also asserts that Judge Crews erroneously "***did not consider***

Vazirabadi's **most important**, **substantive** and **consequential** reply (DOC # 126)

against [DPS's Response to his February 8, 2019 Motion to Amend]." (ECF No. 129

at 1, ¶ 3 (emphasis in original); *see also id*. at 2, 6 ¶¶ 4, 11.) Lastly, Plaintiff claims that

he "presented many good causes [in] previous filed documents, such as DOCS#s 108,

117, 118, 122 and **most importantly:** DOC# 126." (*Id*. at 6, ¶ 11 (emphasis in

original).)

3.    Analysis

The Court finds Plaintiff's arguments again to be wholly without merit. While the

Court recognizes that the good cause requirement may be satisfied "if a plaintiff learns

new information through discovery," *Gorsuch*, 711 F.3d at 1240, it is abundantly clear

that Plaintiff's February 8, 2019 Motion to Amend is not based on new information as

Plaintiff appears to contend. Rather, Plaintiff seeks to amend his complaint based on

information that Plaintiff knew about long before he initiated this action on May 15,

2017—namely, Johnson and Gwaltney's statements that Plaintiff performed poorly in

his panel interview.

Indeed, Plaintiff attached as an exhibit to his February 8, 2019 Motion to Amend

the Position Statement DPS submitted to the Equal Employment Opportunity

Commission on February 26, 2017.[5] (*See* ECF No. 118 at 144–49.) In the Position

Statement, DPS discusses much of the information included in Johnson and Gwaltney's

_____

[5] Plaintiff has included DPS's Position Statement in numerous filings. (*See, e.g.*, ECF No. 26 at 35, 38; ECF No. 108-1 at 66–71; ECF No. 117 at 27–32.) Indeed, excerpts of the Position Statement were even included in his original complaint. (ECF No. 1 at 26, 28.)

affidavits.  (*Compare id*., *with* ECF No. 116-1 at 1–4, *and* ECF No.116-5.)  In pertinent

part, the Position Statement discusses how Plaintiff was interviewed by Johnson and

Gwaltney and details how Plaintiff "performed poorly" in his panel interview.  (ECF

No. 118 at 144–46.)  Notably, the section discussing Plaintiff's poor performance in his

panel interview is quite similar to the corresponding sections in Johnson and Gwaltney's

affidavits.  (*Compare id*. at 145–46, *with* ECF No. 116-1 at 2–3, ¶ 9, *and* ECF No. 116-5

at 1, ¶ 4.)  Thus, it is beyond dispute that Plaintiff's February 8, 2019 Motion to Amend

is not based on new information.

Moreover, the Court notes that during Gwaltney's deposition on August 16, 2018,

Plaintiff discussed how he was considering bringing claims against Gwaltney in this

action.  (*See* ECF No. 122 at 15.)  Yet, Plaintiff waited another 176 days after that date,

even though the deadline for adding parties had elapsed, to seek leave to add

Gwaltney to this lawsuit.  (ECF No. 118.)

Plaintiff appears to acknowledge to a certain extent that the information

contained in Johnson and Gwaltney's affidavits is not new information, arguing instead

that "neither [Johnson or Gwaltney's] depositions, nor [DPS's] previous filings[,] ever

made such **_direct_** and **brazen** false statements against Vazirabadi's 9/10/2015 panel

interview performance."  (*Id*. at 4, n.1 (emphasis in original).)  The Court finds this

argument to be unpersuasive.  It is immaterial whether the description of Plaintiff's

performance at the panel interview was more direct in the affidavits than in DPS's

previous filings.  What matters is that Plaintiff knew of the underlying conduct

surrounding his belated claims against Johnson and Gwaltney, and simply failed to

raise them until it was too late.  *See Gorsuch*, 711 F.3d at 1240.

In regard to Plaintiff's allegation that Johnson and Gwaltney's affidavits substantiate all of his claims, the Court finds such an assertion to be completely without support.  Rather, after reviewing the affidavits and the relevant pleadings, the Court finds the opposite to be true.  Indeed, Plaintiff himself previously noted in his Response to DPS's Motion for Summary Judgment the "devastating effect" that these affidavits have on his claims.  (ECF No. 117 at 4, ¶ 6.)

As to Plaintiff's contention that Judge Crews erroneously failed to consider his Reply to DPS's Response to his February 8, 2019 Motion to Amend, the Court finds such an argument to be unpersuasive.  (*See* ECF No. 129 at 1, ¶ 3; *see also id*. at 2, 6 ¶¶ 4, 11.)  At the March 15, 2019 status conference, Judge Crews explained to Plaintiff that he did not have Plaintiff's Reply when the Recommendation was issued.  (*See* ECF No. 133 at 12–13.)  Judge Crews also explained that he did not need to wait for the Reply before issuing his order.  (*Id*.)  This explanation was reitterated in Judge Crews's Recommendation.  (*See* ECF No. 125 at 1, n.1 (citing D.C.Colo.LCivR. 7.1 (nothing "precludes a judicial officer from ruling on a motion at any time after it is filed")).)

Nonetheless, the Court has decided to consider Plaintiff's Reply to determine whether it would have any bearing on the disposition of his February 8, 2019 Motion to Amend.  In the Reply, Plaintiff discusses how he believes the Court is awaiting the outcome of his appeal in a very similar case, *Vazirabadi v. Denver Health & Hosp. Auth.*, No. 17-CV-01737-RBJ (the "*Denver Health* lawsuit").  (ECF No. 126 at 1, ¶ 2; *see also id*. at 2, 4.)  In the *Denver Health* lawsuit, Plaintiff brought claims pursuant to

27

Title VII and the ADEA against Denver Health and Hospital Authority and others for age and national origin discrimination after the hospital did not hire him. (*Denver Health*, *see* ECF No. 112.)

On October 11, 2018, United States District Judge R. Brooke Jackson denied Plaintiff's motion for leave to file an amended complaint and granted the defendants' motion for summary judgment. (*Id*.) The next day, Plaintiff appealed Judge Jackson's order, and that appeal is currently before the Tenth Circuit. (*Denver Health*, ECF No. 115.) Plaintiff appears to argue that since Johnson and Gwaltney's affidavits were filed after he appealed, the Court should allow him to amend his complaint. (ECF No. 126 at 2.)

The rest of the Reply addresses Plaintiff's perceived inconsistencies regarding when the panelist used their interview notes, when these notes were discarded, and whether a candidate ranked with the highest numerical number is actually the top-ranked candidate. (*Id*. at 2–4.) The Court finds the arguments contained in Plaintiff's Reply to be meritless and concludes that they have no bearing on the disposition of Plaintiff's February 8, 2019 Motion to Amend. As for the other documents that Plaintiff cites to demonstrate good cause—namely, ECF Nos. 108, 117, 118, & 122—the Court has reviewed these filings *de novo* and has likewise found that they do not demonstrate the requisite showing of good cause needed for this Court to modify the Scheduling Order pursuant to Rule 16(b).

In sum, Plaintiff has failed to show that the June 30, 2018 Deadline could not have been met despite his diligent efforts. *See Gorsuch*, 711 F.3d at 1240. Rather, it

is evident from the record that Plaintiff knew of the information underlying his February 8, 2019 Motion to Amend before he initiated this action on May 15, 2017. (*See* ECF No. 118 at 144–49.) As a result, Plaintiff has failed to satisfy Rule 16(b)'s good cause inquiry and therefore Plaintiff is not entitled to leave to amend.[6] *See Gorsuch*, 711 F.3d at 1240–41. Accordingly, the Court adopts the Recommendation to the extent is denies Plaintiff's February 8, 2019 Motion to Amend.

## D.    Rule 11 Sanctions

In its Response to Plaintiff's February 8, 2019 Motion to Amend, DPS requested that the Court impose Rule 11 sanctions against Plaintiff and grant DPS its costs, including reasonable attorney fees, incurred in responding to the motion. (ECF No. 124 at 10–11.) In support, DPS noted the following: "Vazirabadi already has one motion to amend the second amended complaint before this Court, and summary judgment is fully briefed. Yet, Vazirabadi has filed another motion nearly identical to the one pending before this Court that largely responds to [DPS's Motion for Summary Judgment]." (*Id*. at 11.) DPS also discussed how Plaintiff "clearly understands" that his Motions to Amend were untimely, and that the information included in his February 8, 2019 Motion to Amend was "not new at all." (*Id*.)

Judge Crews entertained DPS's request and determined that, although Plaintiff's Motions to Amend were "without merit," he would not impose Rule 11 sanctions against

---

[6] In the Recommendation, Judge Crews found that Plaintiff's February 8, 2019 Motion to Amend should also be denied because Plaintiff had failed to satisfy Rule 15(a). (ECF No. 125 at 9–12.) Because the Court has found that no good cause exists for amending the Scheduling Order, it need not consider the Recommendation's findings, nor Plaintiff's objections, concerning whether Plaintiff has satisfied Rule 15(a). *See Gorsuch*, 771 F.3d at 1240–41.

Plaintiff. (ECF No. 125 at 12.) Judge Crews, however, informed Plaintiff that he could be sanctioned in the future if he continues to file motions in this case that lack proper legal support. (*Id*.)

The Court notes that Judge Crews's decision regarding Rule 11 sanctions was non-dispositive and therefore it most likely raises a Rule 72(a) issue. However, neither party has objected to Judge Crews's decision to not impose sanctions against Plaintiff. (*See* ECF Nos. 129 & 134.) Thus, even if Judge Crews's decision regarding sanctions raises a Rule 72(b) issue, the Court would review Judge Crews's Rule 11 analysis for clear error. *See 2121 East 30th St.*, 73 F.3d at 1060 ("[A] party's objections to the magistrate judge's report and recommendation must be both timely *and specific* to preserve an issue for *de novo* review by the district court") (emphasis added).

The Court finds that Judge Crews's analysis concerning Rule 11 sanctions was thorough and sound, and that there is no clear error on the face of the record. *See Bertolo v. Benezee*, 2013 WL 1189508, at *1 (D. Colo. Mar. 22, 2013) ("In the absence of a timely and specific objection, 'the district court may review a magistrate . . . [judge's] report under any standard it deems appropriate'") (quoting *Summers v. Utah*, 927 F.2d 1165, 1167 (10th Cir. 1991), *aff'd*, 601 F. App'x 636 (10th Cir. 2015).

Moreover, the Court would not grant DPS's request in the first place because a request for Rule 11 sanctions "must be made separately from any other motion"—which DPS has not done. Fed. R. Civ. P. 11(c)(2). Rule 11 also requires proof that DPS first gave Plaintiff warning of its intent to seek such sanctions and twenty-one days to withdraw the offending filing. *See* Fed. R. Civ. P. 11(c)(2). DPS has not offered such

proof.  (*See* ECF No. 124 at 10–12.)  Thus, even if the Court were to find that Judge

Crews's decision regarding sanctions implicates Rule 72(b), the Court would still adopt

the Recommendation and not impose Rule 11 sanctions upon Plaintiff.

## V.  MOTION FOR SUMMARY JUDGMENT

In the March 28, 2019 Recommendation (referred to as the "Recommendation"

for the remainder of this Section V), Judge Crews recommended that DPS's Motion for

Summary Judgment (ECF No. 116) be granted and Plaintiff's Second Amended

Complaint (ECF No. 67) be dismissed with prejudice.  (ECF No. 135.)  In his April 11,

2019 Objection (referred to as the "Objection" for the remainder of this Section V),

Plaintiff disputes various portions of the Recommendation.  (ECF No. 136.)  After

discussing the controlling law, this Court will address Judge Crews's findings and

Plaintiff's objections in turn.

## A.    National Origin and Age Discrimination

### 1.    Legal Standard

Plaintiff claims he was not hired because of his national origin and age, and

brings claims under Title VII and the ADEA.  (ECF No. 67 at 10–12.)  Since Plaintiff

offers no direct evidence of impermissible discrimination, the burden-shifting framework

of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), governs his claims.

The *McDonnell Douglas* framework involves a three-step analysis.  *See Garrett

v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002).  "First, the plaintiff must

prove a prima facie case of discrimination.  If the plaintiff satisfies the prima facie

requirements, the defendant bears the burden of producing a legitimate,

nondiscriminatory reason for its action." *Id*. "If the defendant makes this showing, the plaintiff must then show that the defendant's justification is pretextual." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000).

To establish a genuine issue of material fact as to pretext, Plaintiff "must demonstrate that [DPS's] 'proffered non-discriminatory reason is unworthy of belief.'" *Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1134 (10th Cir. 2010) (quoting *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1065 (10th Cir. 2009)). Plaintiff "can meet this standard by producing evidence of 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [DPS's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that [DPS] did not act for the asserted non-discriminatory reasons." *Reinhardt*, 595 F.3d at 1134 (quoting *Pinkerton*, 563 F.3d at 1065); *see also Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010). If Plaintiff "advances evidence upon which a factfinder could conclude that [DPS's] allegedly nondiscriminatory reasons for the employment decisions are pretextual, the court should deny summary judgment." *Reinhardt*, 595 F.3d at 1134.

2.      *Prima Facie* Case of Discrimination

Judge Crews determined that Plaintiff failed to prove even a *prima facie* case of age or national origin discrimination.  (*See* ECF No. 135 at 7–11.)  Plaintiff objects to this finding.  (*See* ECF No. 136 at 3–4.)  However, because the Court concludes that Plaintiff has not made a showing of pretext, the Court need not resolve Plaintiff's objections regarding his *prima facie* case.

3.    DPS's Legitimate, Non-Discriminatory Reasons for Not Hiring Plaintiff

In the Recommendation, Judge Crews determined that DPS had satisfied its burden in providing legitimate, non-discriminatory reasons for not hiring Plaintiff.  (ECF No. 135 at 11.)  In particular, the Recommendation noted that DPS claims it did not hire Plaintiff because: "(1) he demonstrated in his panel interview that he did not possess the requisite facilitation skills for the PIE position; (2) he had gaps in his professional employment history; [and] (3) [DPS] determined that the candidates who were selected were more qualified."  (*Id.*)

It is unclear whether Plaintiff objects to Judge Crews's finding that DPS had satisfied its burden in providing legitimate, non-discriminatory reasons for not hiring Plaintiff.  (*See* ECF No. 136.)  The Court notes, however, that at this stage, DPS need only "explain its actions against the plaintiff in terms that are not facially prohibited by Title VII."  *Jones v. Denver Post Corp.*, 203 F.3d 748, 753 (10th Cir. 2000) (internal citations omitted).  Having preferred these justifications, the Court finds that DPS has met its burden.  As a result, the burden returns to Plaintiff to demonstrate that DPS's justifications are pretextual.

4.    Pretext

In the Recommendation, Judge Crews concluded that even if Plaintiff had satisfied the first step of the *McDonnell Douglas* framework by proving a *prima facie* case of discrimination, Plaintiff's claims would still fail under the framework's third step as he had failed to show that DPS's justifications for not hiring him were pretextual.  (ECF No. 135 at 11.)  In particular, Judge Crews found that Plaintiff "has offered no competent evidence suggesting that [DPS's] reasons [for not hiring Plaintiff] were

pretextual." (*Id.*)

Judge Crews noted that "[w]hile Vazirabadi points to his 20 years of relevant experience and his written team facilitation narrative description of the group discussion he facilitated in his panel interview, the record is devoid of any 'facts showing an overwhelming disparity in qualifications' in his favor." (*Id.* at 12 (internal citation omitted) (quoting *Johnson*, 594 F.3d at 1211).)

Judge Crews then addressed Plaintiff's argument concerning the destruction of the interview notes taken by the panel members. Judge Crews found that "the fact that Johnson collected and discarded all the panelists' interview notes sometime after the interviews, and before offering the positions to the top-ranked candidates, [does not] support a finding of pretext." (ECF No. 135 at 13.) Judge Crews discussed how "Johnson collected and discarded the panelists' notes as they pertained to all five candidates . . . , [but] did not discard interview notes only as they pertained to Vazirabadi." (*Id.*)

In addition, Judge Crews noted how Plaintiff's argument concerning the destruction of the interview notes "is essentially an assertion that DPS is guilty of evidence spoliation." (*Id.*) Judge Crews observed that to "obtain sanctions for spoliation of evidence, a party must first show that '(1) a party ha[d] a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence.'" (*Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1032 (10th Cir. 2007).)

Judge Crews determined, however, that "DPS destroyed the interview notes at a

time *before* its preservation duty was triggered." (ECF No. 135 at 14 (emphasis in original).) Specifically, Judge Crews found that the "evidence in the record indicates that these notes were destroyed sometime between September 10, 2015 . . . and September 24, 2015," but the "earliest date . . . DPS's duty to preserve could have been triggered" was October 20, 2015. (*Id*. at 14–15.) Therefore, Judge Crews determined that "DPS's destruction of the interview notes does not raise any triable issue of material fact affecting summary judgment." (*Id*. at 15.) For all these reasons, Judge Crews concluded that Plaintiff failed to show that DPS's justifications for not hiring him were pretextual. (*Id*. at 11–15.)

Pursuant to a liberal reading of Plaintiff's Objection to Judge Crews's decision on his claim of national origin discrimination, the Court understands Plaintiff to be arguing that DPS's reasons for not hiring him were pretextual based on the following grounds: (1) DPS discarded the panel interview notes and thus an adverse inference should be applied against it to remedy the spoliation; (2) DPS presented contradictory testimony; (3) DPS's bilingual question caused a disparate impact; and (4) Plaintiff was more qualified than the candidates who were ultimately hired for the two PIE positions. (*See* ECF No. 136.) The Court will address each argument in turn.

a.    *Adverse Inference Sanction*

"Even in cases where [schools] destroy evidence they are required to retain under 29 C.F.R. § 1602.[40], plaintiffs must be diligent in the defense of their own interests, and should seek sanctions under Federal Rule of Civil Procedure 37 to remedy any prejudice caused by spoliation." *Turner*, 563 F.3d at 1149 (internal

quotations marks omitted). "When a plaintiff fails to seek sanctions under Rule 37 and thus forecloses access to the substantial weaponry in the district court's arsenal, the plaintiff's only remaining option is to seek sanctions under a spoliation of evidence theory." *Id*. (internal quotation marks omitted). Thus, parties proceed at their own peril in choosing not to seek lesser discovery-related sanctions at an earlier phase of litigation, then later requesting an adverse inference, as Plaintiff does here. *See Mueller v. Swift*, 2017 WL 2362137, at *5 & n.4 (D. Colo. May 31, 2017).

"Spoliation sanctions are proper when '(1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence.'" *Turner*, 563 F.3d at 1149 (quoting *Grant*, 505 F.3d at 1032). "But if the aggrieved party seeks an adverse inference to remedy the spoliation, it must also prove bad faith." *Id*. "Mere negligence in losing or destroying records is not enough because it does not support an inference of consciousness of a weak case." *Id*. (quoting *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997)).

In the Objection, Plaintiff argues that Judge Crews erred in finding that a spoliation sanction should not be imposed against DPS because "regardless of any early, late or no notification to DPS" that litigation was imminent, "29 C.F.R. § 1602.40 and DPS GBA policy" required DPS to preserve the interview notes for two years. (ECF No. 136 at 4.) Plaintiff also argues that DPS should have known about its duty to preserve the interview notes because it is a "sophisticated litigator." (*Id*. at 5–6.) In addition, Plaintiff argues that an adverse inference sanction is proper because he was

prejudiced by destruction of the interview notes, which DPS destroyed "intentionally and in bad faith."  (*Id*. at 6–8.)

It is clear Plaintiff has misinterpreted the first prong that must be satisfied in order to obtain spoliation sanctions.  Plaintiff does not dispute Judge Crews's findings that the interview notes were destroyed before September 24, 2015, and that the earliest date DPS's duty to preserve could have been triggered was October 20, 2015.  (*See id*. at 2, 4–8, 17.)  Instead, he argues that it matters not whether DPS knew, or should have known, that litigation was imminent because DPS violated a federal regulation and "DPS GBA policy."  This is clearly not the standard.  *See Turner*, 563 F.3d at 1149.  Since it is undisputed that DPS discarded the interview notes before it knew, or should have known, litigation was imminent, spoliation sanctions are not appropriate.

Although more is surely not needed in this regard, the Court notes that the record does not support the finding that Plaintiff was prejudiced by the destruction of the interview notes.  According to Plaintiff, the interview notes were "very extensive hiring documentation that proves Vazirabadi's excellent panel interview, as the highest ranked candidate for hiring."  (ECF No. 136 at 6.)  But there is simply nothing in the record to support this statement, other than Plaintiff's own subjective opinion about how he performed.  Indeed, the record amply supports the finding that Plaintiff preformed poorly in his panel interview.

Moreover, the record is likewise devoid of anything that could support the notion that DPS or the panel interviewers acted in bad faith when they discarded the interview notes.  At the most, the record supports the finding that they were negligent in their

conduct, but "[m]ere negligence in losing or destroying records is not enough because it does not support an inference of consciousness of a weak case."  *Turner*, 563 F.3d at 1149.  As a result of the foregoing, the Court denies Plaintiff's request for spoliation sanctions, including an adverse inference.

        b.   *Sham Affidavits*

In order to show that DPS's reasons for not hiring him were pretextual, Plaintiff argues that Johnson and Gwaltney produced "sham affidavits." (ECF No. 136 at 8–11.) In particular, Plaintiff argues that through their depositions and affidavits, "Johnson and Gwaltney present three different versions of hiring records destruction." (*Id*. at 2, 9, 17.) Plaintiff asserts that "by presenting Johnson and Gwaltney's contradictory affidavits, [DPS] is attempting to create a sham fact issue—a sham fact that Vazirabadi did poorly in [his] panel interview." (*Id*. at 9 (emphasis omitted).)  Plaintiff claims that Judge Crews "erred in neither acknowledging nor considering Vazirabadi's arguments in support of Johnson and Gwaltney's sham affidavits." (*Id*. at 10.)

Plaintiff's allegation that Johnson and Gwaltney produced "sham affidavits" is based on the following sequence of events.  (*See* ECF No. 122 at 7–8.)  On September 10, 2015, Plaintiff's panel interview took place. (ECF No. 116-1 at 2, ¶ 9.)  After the last panel interview on September 21, 2015, the panelists ranked the candidates.  (ECF No. 122 at 7 (citing ECF No. 116-1 at 3, ¶ 11; ECF No. 116-5 at 2, ¶ 6).)  In his deposition, Gwaltney acknowledged that he made notes on his two-page interview sheet during Plaintiff's panel interview.  (ECF No. 122 at 14; *see also id*. at 12–13.)

At the bottom of the interview sheet's second page, there is an "Overall Ranking"

index from "1" to "9"—with "1" being categorized as "Fail" and "9" being categorized as "Pass."  (*Id*. at 13.)  When asked whether he used the ranking index during the September 21 discussions, Gwaltney replied: "I believe I used that."  (*Id*. at 15.) According to Plaintiff, Gwaltney thus confirmed that he used the interview sheet he took notes on throughout Plaintiff's September 10 panel interview during discussions that took place on September 21.  (*Id*. at 7.)

Plaintiff claims that later in his deposition, Gwaltney "totally recants" his statement that he used the interview notes pertaining to Plaintiff during the September 21 discussions.  (*Id*.)  During the deposition, Plaintiff inquired as to when Gwaltney discarded the interview notes.  (*Id*. at 7, 11.)  Gwaltney responded that he "[does not] remember specifically" when he shredded the notes, but that it was "[s]hortly after the interview."  (*Id*.)

Based on these sequence of events, Plaintiff claims that "Gwaltney is making very contradictory statements, where on one hand he claims '*shortly after*' Varzirabadi's panel interview on September 10, 2015, he '*shredded*' Vazirabadi's interview notes.  On the other hand, he also admits *using* Vazirabadi's two-page interview sheet on that Sep. 21, 2015 meeting—**11 days after** Vazirabadi's interview."  (*Id*. at 8 (internal citation omitted) (emphasis in original).)

Next, Plaintiff points to a sentence contained in DPS's Reply in Support of its Motion for Summary Judgment, wherein DPS stated: "[Johnson] collected and discarded all the panelists' notes as soon as the interviews were complete because once the team had ranked the candidates, she had all the data she needed to make a

hiring decision."[7]  (*Id*. (quoting ECF No. 121 at 3).)

Based on the forgoing events, Plaintiff discusses how "Johnson and Gwaltney

present three different versions of hiring records destruction":

> [DPS's statement that Johnson] **_collected_** *and* **_discarded_**
> **_all_** *the* **_panelists' notes_** *as soon as the interviews were*
> **_complete_***..." **100% contradicts** with **_both versions_** of
> Mr. Gwaltney's deposition narratives.  In one version,
> Mr. Gwaltney "*shredded*" Vazirabadi's interview notes *shortly*
> *after* Vazirabadi's interview on **September 10, 2015**.
> Mr. Gwaltney **_did not give_** his notes to Ms. Johnson for its
> *destruction*.  In another version, Mr. Gwaltney, *again*, *without*
> giving Vazirabadi's interview notes to Ms. Johnson to be
> "*discarded*", Mr. Gwaltney stated he "**_used_**" it on September
> 21, 2015.  By simple fact checking, [DPS] should have
> noticed Ms. Johnson and Mr. Gwaltney statement are
> contradictory with no factual basis for Court's filing.

(ECF No. 122 at 8 (emphasis in original) (internal citations omitted).)  Plaintiff alleges

that by presenting Johnson and Gwaltney's contradictory, "sham affidavits," DPS is

"attempting to create a sham fact . . . that Vazirabadi did poorly in [his] panel interview."

(ECF No. 136 at 9 (emphasis omitted).)

"Sham affidavits, though 'unusual,' arise when a witness submits an affidavit that

contradicts the witness's prior testimony."  *Knitter v. Corvias Military Living, LLC*, 758

F.3d 1214, 1218 n.3 (10th Cir. 2014) (quoting *Law Co. v. Mohawk Const. & Supply Co.*,

577 F.3d 1164, 1169 (10th Cir. 2009)).  Although "[a]n affidavit may not be disregarded

solely because it conflicts with the affiant's prior sworn statements," the Court may

nonetheless disregard a conflicting affidavit if it "constitutes an attempt to create a sham

---

[7] In support of this statement, DPS cites Johnson's deposition testimony.  (ECF No. 121 at 3 (citing ECF No. 121-1 at 17).)  Although the testimony DPS references discusses how Johnson had all of the data she needed to make a hiring decision, it does not address who destroyed the interview notes or when.  (ECF No. 121-1 at 17.)

fact issue." *Mohawk*, 577 F.3d at 1169; *see also Knitter*, 758 F.3d at 1218 n.3. In

determining whether

> an affidavit creates a sham fact issue, [courts] consider
> whether: "(1) the affiant was cross-examined during his
> earlier testimony; (2) the affiant had access to the pertinent
> evidence at the time of his earlier testimony or whether the
> affidavit was based on newly discovered evidence; and
> (3) the earlier testimony reflects confusion which the affidavit
> attempts to explain."

*Mohawk*, 577 F.3d at 1169 (quoting *Ralston v. Smith & Nephew Richards, Inc.*, 275

F.3d 965, 973 (10th Cir. 2001)).

This is clearly not an instance of a witness submitting an affidavit that contradicts

the witness's prior testimony. *See Knitter*, 758 F.3d at 1218 n.3. Notably, Plaintiff does

not once point to where Johnson and Gwaltney's affidavits conflict with their prior sworn

statements. (*See* ECF No. 136 at 8–11.) Instead, the alleged "inconsistent statements"

Plaintiff points to solely occurred during earlier deposition testimony and a sentence in

a Reply filing. (*See id*.)

Moreover, the affidavits do not attempt to explain any confusion that could

potentially arise from these alleged inconsistent statements. (*See* ECF No. 116-1

at 1–4; ECF No. 116-5.) Indeed, the affidavits do not once mention the interview notes

or when or how they were discarded. (*See id*.) Interestingly, in Plaintiff's analysis of

the third consideration of the sham affidavit doctrine—whether the earlier testimony

reflects confusion which the affidavit attempts to explain—Plaintiff states "[Johnson and

Gwaltney's] earlier testimony *does not* reflect[ ] confusion which the affidavit[s]

attempt[ ] to explain." (ECF No. 136 at 9 (alteration incorporated) (emphasis added).)

41

In sum, this is clearly not an issue implicating the sham affidavit doctrine.

To the extent Plaintiff is discussing these alleged inconsistent statements to show that DPS's reasons for not hiring him were pretextual, the Court finds Plaintiff's argument to be largely without merit. To establish a genuine issue of material fact as to pretext, Plaintiff "must demonstrate that [DPS's] proffered non-discriminatory reason is unworthy of belief . . . by producing evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [DPS's] proffered legitimate reasons." *Reinhardt*, 595 F.3d at 1134 (internal quotation marks omitted). Plaintiff clearly has not made such a demonstration. Notably, Plaintiff does not explain how the alleged inconsistent statements contradict DPS's proffered reasons for not hiring him. Even if the Court generously construes Plaintiff's argument and finds that there is an inconsistency as to whether Gwaltney or Johnson destroyed the interview notes, and whether that event took place before or after the September 21 discussion, the Court finds that this would not amount to a genuine issue of material fact as to pretext.

c. *Bilingual Questioning*

In his Objection, Plaintiff claims that Judge Crews entirely ignored his disparate impact claim. (ECF No. 136 at 6.) However, Plaintiff did not raise his disparate impact claim in his Response to the Motion for Summary Judgment or in his Surreply. (*See* ECF Nos. 117 & 122.) Nonetheless, Plaintiff claims that he has "continuously, [and] in many filings, made arguments that DPS subjects 100% of its job applicants to bilingual questioning," though he fails to cite or reference those filings. (ECF No. 136 at 11.) Thus, the issue of disparate impact was not before the Magistrate Judge on summary judgment, and is deemed forfeited. *United States v. Garfinkle*, 261 F.3d 1030, 1031

42

(10th Cir. 2001) ("In this circuit, theories raised for the first time in objections to the magistrate judge's report are deemed waived"); *see also Pevehouse v. Scibana*, 229 F. App'x 795, 796 (10th Cir. 2007).

Nevertheless, the Court will briefly address the arguments Plaintiff raised in the Objection regarding his disparate impact claim. (*See* ECF No. 136 at 11–12.) "To survive summary judgment on an individual claim for disparate impact requires three steps":

> First, [Plaintiff] must establish a prima facie case that (a) an employment practice (b) causes a disparate impact on a protected group. Second, if [Plaintiff] presents a prima facie case, the burden will shift to [DPS] to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity. Third, assuming [DPS] shows business necessity, [Plaintiff] may still prevail by showing that the employer refuses to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs.

*Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1220–21 (10th Cir. 2013) (internal citations and quotation marks omitted). It is abundantly clear that Plaintiff has failed to establish a *prima facie* case that DPS's bilingual questioning causes a disparate impact on a protected group.

In the Objection, Plaintiff appears to allege that DPS's employment practice of asking applicants whether they are bilingual in a language causes a disparate impact on various protected groups. (*See* ECF No. 136 at 11–12.) Plaintiff cites statistics about the number of DPS applicants who identified themselves as being bilingual in either "Amharic," "Arabic," "Somali," or an unlisted language. (*Id*. at 12.) That is the extent of Plaintiff's support for his disparate impact claim. (*See id*. at 11–12.) Notably,

Plaintiff does present any evidence to support his claim that DPS's question about whether an applicant is bilingual in a language causes a disparate impact on any group. (*See id*.) Thus, Plaintiff has failed to establish even a *prima facie* case of disparate impact discrimination. *See Tabor*, 703 F.3d at 1220. Therefore, for this additional reason, Plaintiff's disparate impact claim cannot survive summary judgment. *See id*.

To the extent Plaintiff is discussing DPS's bilingual question to show that DPS's reasons for not hiring him were pretextual, the Court finds such an argument to be wholly without merit. To establish a genuine issue of material fact as to pretext, Plaintiff "must demonstrate that [DPS's] proffered non-discriminatory reason is unworthy of belief." *Reinhardt*, 595 F.3d at 1134. Plaintiff clearly has not made such a demonstration as Plaintiff does not attempt to explain how DPS's bilingual question illustrates "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [DPS's] proffered legitimate reasons" for not hiring him. *Id*.

        d.    *Plaintiff's Qualifications*

In his Objection, Plaintiff argues that Judge Crews mistakenly determined that DPS's justifications were not pretextual because the record was devoid of any facts showing that Plaintiff was more qualified than the applicants DPS ultimately hired. (ECF No. 136 at 16–17.) In support, Plaintiff discusses how: (1) Johnson's affidavit confirms that Plaintiff worked for over 20 years in the engineering profession, with experience in both process improvement and project management; (2) his cover letter reviewed in detail how his past projects correlated with the "essential functions" of a PIE, which Johnson commented on approvingly during his phone interview; (3) he

performed well in response to the Facilitation Question, as displayed in his "Team Facilitation Narrative"; (4) Judge Crews failed to examine his cover letter and resume; (5) in comparing his cover letter and resume with those of the hired candidates, "his qualification, unequivocally, in content, nature of the projects and accomplishments, is well above both hired candidates"; and (6) he has more applicable experience for the PIE position than the hired candidates. (*Id*. (emphasis omitted).)

A court "will draw an inference of pretext where the facts assure [the court] that the plaintiff is better qualified than the other candidates for the position." *Santana v. City & Cnty. of Denver*, 488 F.3d 860, 865 (10th Cir. 2007) (internal quotation marks omitted). The Tenth Circuit has "cautioned that pretext cannot be shown simply by identifying minor differences between plaintiff's qualifications and those of successful applicants, but only by demonstrating an *overwhelming* merit disparity." *Id*. (internal quotation marks omitted) (emphasis added). Moreover, it is not the Court's "role to act as a super personnel department that second guesses employers' business judgments." *Id*. (internal quotation marks omitted).

Under these standards, the differences between Plaintiff's and the hired candidates qualifications does not come close to suggesting pretext. Nguyen has a Bachelor of Science in Materials Science and Engineering from Cornell University's College of Engineering and had over six years of relevant engineering experience at CoorsTek and Surmet Corporation, with no gaps in his professional employment. (ECF No. 116-1 at 17–18.) Schroeder has a Bachelor in Science in Industrial Engineering from the University of Michigan's College of Engineering and had over five years of relevant engineering experience at Intel Corporation with no gaps in her professional

employment.  (*Id*. at 19–20.)

Plaintiff has a Bachelor of Science in Industrial Engineering from the University of Wisconsin–Stout and over 20 years of engineering experience.  (*Id*. at 15–16.)  While it is undisputed that Plaintiff had many years of relevant experience, his sole occupation for the two years before he applied for the PIE position had been as an UberX driver. (*Id*. at 2, 15 ¶ 7.)  Moreover, although Plaintiff worked as a project engineer for Cablenet Wiring Products from July 2005 through September 2013 and held various engineering positions at eight different companies from 1987 until 2001, he had a gap in professional employment from April 2001 until May 2005 when he served as an unpaid caregiver.  (*Id*. at 15–16.)  In addition, when comparing Plaintiff's cover letter and resume with that of Schroeder and Nguyen, the Court simply cannot conclude that there is an "overwhelming merit disparity."  *Santana*, 488 F.3d at 865.  (*Compare* ECF No. 116-1 at 13–16, *with id*. at 17–20.)

The record also provides that an important qualification for the position was the applicant's facilitation skills.  (ECF No. 116-1 at 2, ¶¶ 4, 8; *see also id*. at 11–12.) Plaintiff has made no argument that he was overwhelmingly more qualified than Schroeder or Nguyen in this regard, nor does the record support such a proposition. (*See, e.g.*, ECF No. 116 at 2–3, ¶ 9; ECF No. 116-5 at 1, ¶ 4; ECF No. 116-6 at 8–9.) Indeed, the record firmly supports the finding that Plaintiff demonstrated inferior facilitation skills when compared to Schroeder and Nguyen.  (*See, e.g.*, ECF No. 116 at 2–3, ¶¶ 9–12; ECF No. 116-5 at 1–2, ¶¶ 4–6.)  Notably, this finding is only countered by Plaintiff's own subjective opinion that he exemplified stronger facilitation skills than

DPS contends.  (*See* ECF No. 117 at 25–26.)

In sum, when considering the qualifications of all three applicants, the Court finds that Schroeder and Nguyen's qualifications were arguably superior, and certainly not overwhelmingly inferior, to Plaintiff's.  As a result, Plaintiff is not entitled to an inference of pretext.  *See Santana*, 488 F.3d at 865.

5.       <u>Failure to Pursue Age Discrimination Claim in Objection</u>

The Court notes that Plaintiff does not appear to dispute the Recommendation's findings in regard to his age discrimination claim.  (*See* ECF No. 136.)  Plaintiff's Objection does not reference his age discrimination claim, the ADEA, or Judge Crews's findings in regard to the claim.  (*See id*.)  Notably, in his conclusion, Plaintiff discusses how he "was refused hiring because of his Iranian national origin," but makes no reference to his age or DPS's alleged age discrimination.  (*Id*. at 19; *see also id*. at 15, ¶ 7.10.)  As a result, the Court reviews Judge Crews's analysis of Plaintiff's ADEA claim for clear error, and finds none.  *See Bertolo*, 2013 WL 1189508, at *1 ("In the absence of a timely and specific objection, 'the district court may review a magistrate . . . [judge's] report under any standard it deems appropriate'") (quoting *Summers*, 927 F.2d at 1167).  Accordingly, the Court adopts the Recommendation to the extent it grants summary judgment in DPS's favor on Plaintiff's ADEA claim.[8]

6.       <u>Summary of Section V</u>

DPS produced legitimate, non-discriminatory reasons for its decision not to hire

---

[8] In any event, the foregoing analysis makes clear that Plaintiff's ADEA claim would likewise not survive summary judgment as he has failed to show that DPS's justifications for not hiring him were pretextual.

47

Plaintiff. Because Plaintiff failed to put forth sufficient evidence to create a genuine issue of material fact on the issue of pretext, the Court adopts the Recommendation to the extent it grants DPS's Motion for Summary Judgment. As a result, the Court will direct the Clerk of the Court to enter judgment in favor of DPS on all claims and terminate this case. Therefore, Plaintiff's Objection to Denial of Motion to Compel (ECF No. 107) is overruled as moot and Plaintiff's Motion for Leave to File Surreply (ECF No. 113) is denied as moot.

## B.    The Doe Defendants

In the caption of his Second Amended Complaint, Plaintiff listed as putative Defendants in this action DPS, the Doe Corporations, the Doe Entities, and the Doe Individuals. (ECF No. 67 at 1.) In his Recommendation, Judge Crews recommended that the Doe Corporations and Doe Entities be dismissed without prejudice. (ECF No. 135 at 15–16.)

In discussing why the "various John and Jane Does" should be dismissed from this action, Judge Crews discussed how there is "no provision in the Federal Rules of Civil Procedure for naming fictitious or unknown parties in a lawsuit." (*Id*. at 15–16, n. 8–9 (citing *Watson v. Unipress, Inc.*, 733 F.2d 1386, 1388 (10th Cir. 1984); *Coe v. U.S. Dist. Court for Dist. of Colo.*, 676 F.2d 411, 415 (10th Cir. 1982)).) Judge Crews recognized that Rule 10(a) of the Federal Rules of Civil Procedure specifies that the "title of a complaint must name all the parties." (ECF No. 135 at 15–16, n. 8.) Judge Crews then concluded that "[b]ecause unnamed parties are not permitted by the Federal Rules, and because Vazirabadi has not identified or named these unknown

defendants, these various John and Jane Does should be dismissed from the action."
(*Id.*)

In his Objection, Plaintiff does not dispute Judge Crews's analysis regarding the Doe defendants, nor his dismissal of the Doe Corporations or the Doe Entities. (*See* ECF No. 136.) As a result, the Court reviews Judge Crews's analysis of the Doe defendants for clear error and finds none. *See 2121 East 30th St.*, 73 F.3d at 1060 ("[A] party's objections to the magistrate judge's report and recommendation must be both timely *and specific* to preserve an issue for *de novo* review by the district court") (emphasis added); *see also Bertolo*, 2013 WL 1189508, at *1 ("In the absence of a timely and specific objection, 'the district court may review a magistrate . . . [judge's] report under any standard it deems appropriate'") (quoting *Summers*, 927 F.2d at 1167).

While Judge Crews ultimately recommended that the Court dismiss the Doe Corporations and the Doe Entities, but not the Doe Individuals, it is clear from his analysis that he intended to likewise recommend the dismissal of the Doe Individuals. (*See* ECF No. 135 at 15–16, & n.8 ("these various John and Jane Does should be dismissed from the action").) This finding is supported by the fact that Judge Crews did not recommend that the Doe Individuals remain as party defendants in this action. (See *id.* at 15–16.) Accordingly, the Court adopts the Recommendation as modified and dismisses without prejudice Plaintiff's claims against the Doe Corporations, the Doe Entities, and the Doe Individuals.

## VII.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.    The March 6, 2019 Recommendation (ECF No. 125) is ADOPTED in its entirety;

2.    Plaintiff's March 12, 2019 Objection (ECF No. 129) is OVERRULED;

3.    Plaintiff's November 30, 2018 Motion to Amend (ECF No. 108) is DENIED;

4.    Plaintiff's February 8, 2019 Motion to Amend (ECF No. 118) is DENIED;

5.    The March 28, 2019 Recommendation (ECF No. 135) is ADOPTED AS MODIFIED;

6.    Plaintiff's April 11, 2019 Objection (ECF No. 136) is OVERRULED;

7.    Defendant DPS's Motion for Summary Judgment (ECF No. 116) is GRANTED as to all claims;

8.    Plaintiff's claims against Defendants Doe Individuals are DISMISSED WITHOUT PREJUDICE;

9.    Plaintiff's claims against Defendants Doe Corporations are DISMISSED WITHOUT PREJUDICE;

10.   Plaintiff's claims against Defendants Doe Entities are DISMISSED WITHOUT PREJUDICE;

11.   Plaintiff's Objection to Denial of Motion to Compel (ECF No. 107) is OVERRULED AS MOOT;

12.   Plaintiff's Motion for Leave to File Surreply (ECF No. 113) is DENIED AS MOOT;

13.   The Clerk of the Court shall enter judgment in favor of Defendant DPS and against Plaintiff, and shall terminate this case; and

14.   Each party shall bear his or its own costs.

Dated this 25th day of June, 2019.

BY THE COURT:

_____

William J. Martínez
United States District Judge